Taylor C. J.
delivered the opinion of the Court.
The law of which the defendant claims the benefit, was passed in 1812, and provides that any Court, rendering judgment against a debtor for debtor damages between the 31st of December in that year and the 1st of February 1814, shall stay the same until the first term or session of the Court after the latter period, upon the defendant’s giving two freeholders as securities. The act also contains sundry details not necessary to be recited.
In deciding the momentous question, whether the will of the legislature, as expressed in this act, be incompatible with the will of the people, as expressed in their fundamental law, the Constitution of the United States, we disclaim all right or power to give judgment against the validity of a legislative act, unless its collision with the constitution appear to our understandings manifest and irreconcilable. On the contrary, if patient and dispassionate consideration of the subject, produce any thing short of entire conviction, we hold ourselves bound to support a law.
The constitutional will of the legislature, inclination, not *386 less than duty, prompts us to execute; for identified as its members are with the other citizens of the community, and faithfully representing their feelings and interests, we can never allow ourselves to think that the acts proceeding from them can be designed for any other purpose than the promotion of the general welfare; or can result from other than the purest and most patriotic motives.
We have deliberately viewed the question in every light in which the arguments of the learned counsel on both sides have presented it, and aided by such additional information as our own research or reflection could furnish, the result of our opinion is, that the law in question is unconstitutional, and cannot be executed by the judicial department, without violating the paramount duty of their oaths, to maintain the constitution of the United States.
This conclusion we derive, first, from the plain and natural import of the words of the constitution of the U. States.
2. From a consideration of the previously existing mischiefs, which it was the design of that valuable instrument to suppress and remedy.
Amongst the important objects, which the people of the United States designed to accomplish by adopting the constitution, that of establishing justice, holds a conspicuous rank. This appears from the solemn declaration of the people themselves in the preamble to that instrument. The enlightened statesmen, by whom it was originally framed, had reaped abundant instruction from history and experirience. Long accustomed to contemplate the operation of those master principles and comprehensive truths, which form, at once, the defences and the ornament of human society; and, which alone can justly form the basis of the social compact; they designed to give them practical effect for the benefit of the American people—to consecrate and make them perpetual. They well knew that while the prin *387 ciple of justice is deeply rooted in the nature and interest of man, and essential to the prosperity of States, it forms the strongest and brightest link in the chain, by which the Author of the Universe has united together the happiness and the duty of his creatures.
To give a proper direction to these general principles, the clause in the constitution which presents the question before us, was inserted. Some of its provisions are transcribed from the articles of confederation; others are added because experience had demonstrated that without them the Union of the States would be imperfect. The words are “No state shall enter into any treaty, alliance or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make any thing but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, &c.”
The obligation of a contract may be impaired by various modes and in different degrees; and the restrictive clause in the constitution does, according to our apprehension of its meaning, annul every act of a State legislature, which shall thereafter produce that effect, plainly and directly in any degree. When, therefore, the validity of the law is maintained by the defendant’s counsel, because it does not allow a debtor, who promises to pay in one thing, to pay in another; because it does not absolutely restrain the debtor from paying according to his engagement: or, because it does not allow a third person to interfere between the contracting parties—the answer is, that the examples cited furnish stronger instances of a violation of the constitution than the case before us; they may with stricter propriety be called cases of annulling a contract; but they certainly do not prove that the obligation of contracts is not impaired by the act under consideration.
Whatever law releases one party from any article of a stipulation, voluntarily and legally entered into by him with *388 another, without the direct assent of the latter, impairs its obligation; because the rights of the creditor are thereby destroyed, and these are ever correspondent to, and coextensive with the duty of the debtor. The first principles of justice teach us that he to whom a promise is made under legal sanctions, should signify his consent, before any part of it can be rightfully cancelled by a legislative act.
The binding force of a contract may likewise be impaired by compelling either party to do more than he has promised. If an act postponing the payment of debts be constitutional, what reasonable objection could be made to an act, which should enforce the payment before the debt becomes due? If, notwithstanding the constitutional barrier, it is competent for the Legislature to hold out to all debtors, that although they fail to pay their debts when they become due, and their creditors are in consequence compelled to sue them, they shall nevertheless be indulged with a certain time beyond the judgment, supperadded to the ordinary delays of the law; may not the Legislature, with equal authority, announce to all creditors the right of suing for their debts and enforcing payment before the day? Yet the rights of both parties established by the contract, are, in the eye of justice, equally sacred; and whether those of the creditor are sacrificed to the convenience of the debtor, or the subject be reversed, we are compelled to think that the constitution is overlooked.
No unimportant part of the obligation of every contract, arises from the inducement the debtor is under to preserve his faith. With many persons, and it may be hoped, the greater number, a sense of justice and respect for character, form motives of sufficient strength; but how rarely does it happen, that a man lending his money, or selling his property on credit, estimates such motives so highly as to deem them a safe and exclusive ground of reliance? In most cases he would reserve both money and property in his own *389 possession, were he not assured, that the law animates the industry and quickens the punctuality of his debtor; and that by its aid, he can obtain payment in six or nine months. Hence the well considered ceremonies of bonds, mortgages, and deeds of trust, more useful as the instruments of coercive justice, than as preserving the evidence of contract. The act under view destroys this assurance, and while it produces a state of things, the existence of which at the time of contract would have restrained the creditor from parting with his property, it encourages the debtor to relax his efforts to be punctual. It weakens his inducements to fulfil his engagement, and thereby impairs its obligation.
The right to suspend the recovery of a debt for one period implies the right of suspending it for another; and as the state of things which called for the first delay, may continue for a series of years, the consequence may be a total stagnation of the business of society, by destroying confidence and credit amongst the citizens.
An argument urged and much relied on by the defendant’s counsel is, that the law in question bears only on the remedy and is therefore within the sphere of legislative authority. But if in so doing it violates the constitution, it is not less invalid, than if it directly touched and annulled the right. Every one will agree, that a law, which should deny to all creditors the power of instituting the action of debt, covenant, assumpsit, or a bill in chancery, would invade the constitution; that a law which should limit the recovery of all debts to so short a period after its passage, that it would be impossible, according to the course of the courts, to obtain a judgment, would also be null and void; though such laws, ostensibly, bear only on the remedy, yet they do in reality, annihilate the right. The law before us, it is conceded, does not go to the extent of either instance, yet it certainly diminishes the importance and value of the right. It is difficult to conceive how a law could otherwise impair an existing *390 right than by withholding the remedy, which is in effect to suspend the right.
The undoubted right of the legislature to alter and reform the judicial system may, it is said, produce delay in the execution of a contract, equal to that which results from the present law: and it is urged that all such acts must, upon the same principle, be declared unconstitutional.
We cannot acquiesce in the final conclusion drawn from these premises, which, without hesitation, we acknowledge to be correct.
All such laws, the Legislature have an unquestionable right to enact, a right which the people have never surrendered, and the exercise of which is not forbidden by the constitution of the United States.
But it must be considered, that the primary and essential object of all such laws, is the promotion of the administration of justice, its advancement and improvement. If delay grow out of them; if any thing that bears the semblance of a violation of contract follow in their train, it is merely the unintended incident and consequence of the exercise of a lawful authority. It is different with the law before us; its very design, as expressed in the title, is to do that against which the constitution has opposed its veto.
Many analogous powers, it is argued, have long existed in the State under the authority of the law; that their exercise has been highly convenient to the citizens, and has been universally acquiesced in; that all these must cease to have effect if the suspension law is unconstitutional, to the manifest detriment of the community.
If such effects follow from our decision, there are no citizens in the State who will more sincerely deplore them than ourselves. But we feel too deeply what we owe to the *391 responsibility of our stations, to the obligation of our oaths, and the rights of the people and their posterity, to be turned aside from what we believe to be the post of duty, by any consideration of the consequences that may arise from continuing in it.
Let all these cases be patiently examined, and we think it will be seen that their analogy is not complete; that they may still exist, and the powers under them be rightfully exercised, notwithstanding the decision in the present case.
The first instance is the stay of execution, which justices are allowed to grant on judgments rendered by them. But here the creditor is not concluded; he may appeal to the county court. Besides, the constitution of the U. S. in the section under consideration, employs the future tense, “No State shall pass laws,” &c. It does not repeal those conflicting laws which were then in force; though several of the States did in obedience to its spirit, forbear to re-enact laws in hostility with it. The law giving this power to magistrates was enacted long before the constitution was adopted.
Another example cited is that of the power constantly exercised by a court of chancery, in giving time to a mortgagor, on a bill filed against him to foreclose, to pay the debt before the decree is made absolute, or the land ordered to he sold.
Such a power has been exercised by that Court from very ancient times, and was one of the modes of administering a remedy on those contracts, known to the parties when they entered into it, and it is a necessary consequence of the principles on which the constitution of the Court compels it to decide the rights of parties to a mortgage.
It is also in strict conformity with natural justice, for the land mortgaged being only a collateral security for the payment of the debt, and so understood by the creditor, he can *392 not be injured if his debt and interest are paid. It is upon the same principle, that a Court of Chancery exercises its jurisdiction of relieving against a penalty; because it is designed to secure the payment of money, and the Court allows the creditor all that he expected when he made the contract. The intention of the parties is in all respects effectuated; and the obligation of the contract is enforced, precisely in the way, both creditor and debtor knew it might be enforced when they entered into it. Another point of view may probably render the subject clearer. Such an order in the Court of Chancery is not at all directed against the contract; but it is the answer of the Court to a mortgagee, who brings his bill against the mortgagor, on whom it prays the Court to lay hands, and make him if he intends to redeem, to do it then, or ever after remain silent. When the Court, therefore, is applied to for the purpose of lending its aid to an individual, in a matter which he deems necessary for his peace, it is clearly in its power to say upon what terms such interposition shall be extended. With the utmost propriety, then, the Court answers it cannot be that a decree of foreclosure shall be made in the case, without giving reasonable time to the mortgagor to redeem.” If there are special cases in which a Court of Chancery gives further time upon a bill to redeem, it must be upon the ground that the substantial understanding and agreement of the parties is that of a security for the money and the interest accruing, without having reference to any particular day of payment, and that the safety of the debt is only intended to be provided for by the mortgage. Hence the mortgagee takes a bond for the debt, and the existence of the mortgage is no objection to the recovery of the debt. The giving further time on a bill to redeem has no influence on the bond, nor does it affect any proceeding to recover the debt in a Court of law. Both jurisdictions move distinctly within the sphere of their respective orbits. The Court of Equity applies itself to the conscience of the party, requiring of him *393 substantially to accept and perform what he originally expected, and what was intended by both parties; thereby enforcing rather than impairing the contract.
The act of 1789 has been pointed out to the notice of the Court, as containing a similar exercise of Legislative power with the one under consideration. That act provides that no execution shall be levied on property of a minor in the hands of his guardian, until twelve months after a judgment on the scire facias.
An examination of the purview of this law will shew that it is supplementary to the act of 1784, by which a remedy is given against heirs, not formerly possessed by the creditor. The heir was at first liable only where he was expressly bound in the obligation of his ancestor, and had also assets by descent. By these laws, which must be construed together, the land in possession of the heir is made liable to creditors after the personal estate is exhausted. That a new remedy given by the Legislature, should be qualified and limited in any way they deem expedient, seems perfectly unexceptionable. Besides, to whom is the indulgence extended? To minors, whose rights the common law, even to a greater degree than equity, has always considered as under its peculiar protection? Its language is “in the case of infants the parol is to demur, and the infant is not bound to answer till full age, and the register, parliament and common law give no execution against an infant heir, although the debt were clear and indisputable as by a judgment or statute” 2 Treatise on Eq. 268.
The right to pass this law is further derived from the 5th section of the Declaration of Rights, “that all power of suspending laws or the execution of laws, by any authority without the consent of the representatives of the people is injurious to their rights and ought not to be exercised.”
This article, like several other excellent ones in the same instrument, is taken mutatis mutandis from the Declaration *394 of Rights, established by the Parliament of England at the beginning of the reign of William III, and was especially designed to secure them against a branch of prerogative, which though exercised by the regal authority, from the time of Henry III, had been employed in the preceding reign, in a manner the most odious and oppressive. With the example of the revolution in England, and the causes producing it, fresh in their remembrance, the convention of this State raised this bulwark against a similar assumption of authority. But the term “laws” must signify such acts as the Legislature have authority to pass, for that cannot be called a law, which the constitution has forbidden to be enacted. The term “ suspend” implies that the act suspended, once had an effectual and constitutional existence. So that if before the adoption of the federal constitution, the Legislature had passed an act inconsistent with the constitution of the State such act could not claim the authority of a law. If, for example, they had directed the judiciary to try all criminals without the intervention of a jury; if they had declared that certain acts theretofore done, and lawfully done, should nevertheless be punishable; that no prisoners should be bailable; it would, we apprehend, have been the sacred duty of the judiciary to refuse to exercute such acts. The persons who have filled that department, from the cessation of the colonial government to the present time, have acted in conformity with this principle, as the judicial records of the country testify. A law is defined a rule of action commanding what is right and prohibiting what is wrong. But the rule prescribed in the supposed cases, would have commanded what was wrong, and prohibited what was right, according to the fundamental law.
Every article in the Declaration of Rights as well as the constitution of the State, is subject to the paramount control of the constitution of the United States, which, being the last solemn expression of the will of the people, annuls and destroys every thing clearly irreconcilable with it.
*395 The definition of a contract, as given by M. Pothier, a writer on the civil law, is quoted to shew that the time of payment is not of the essence of a contract. The writers on that law have made various subtle distinctions relative to the qualities of a contract; but as we cannot perceive that any inference can be drawn from the words of Pothier applicable to this subject, except such as other parts of the work explain away, a very brief notice of it will be sufficient.—His words are, “there are three different things to be distinguished in every contract; things which are of the essence of a contract, things which are only of the nature of the contract, and things which are merely accidental to it.” After explaining at length the essence and the nature of the contract, he illustrates what he means by the accidental things, which, he says, are only included in the contract by express agreement, “For instance, the allowance of a certain time for paying the money due; the liberty of paying it by instalments, that of paying another thing instead of it, of paying to some other person than the creditor, and the like, are accidental to the contract, because they are not included in it, without being particularly expressed.” The just inference from this passage is, that even the accidental things, if inserted in the contract, form a part of its obligation. That the civil law viewed them in this light, is evident from other parts of the same writer, where he distinguishes between a term of right and a term of grace; the first making a part of the agreement, the latter not. 1 Pothier, P. II, Cha. 3. 131, Evan’s Translation.
To this statement of the reasons why the analogy of the cases relied upon, appears to us imperfect, it is only necessary to subjoin this general remark, that none of them have been directly brought into judgment; and if they should appear to be infringements of the constitution, it cannot follow that the acquiescence in them will justify a repetition. The construction we give to the constitution would have been *396 adopted by us from a consideration of the instrument itself but we think it fortified by the collateral illustrations furnished by the other ground of our opinion.
2. It is to be seen in the historical records of some of the States, that, pressed and exhausted by their efforts in the great struggle for independence, they had recourse to various expedients to relieve their suffering citizens. In addition to the issue of bills of credit and paper money, some laws were passed wholly changing the nature of the contract; others postponed the payment of debts, by authorising it to be made in instalments. The benefit resulting from these measures was partial and temporary; but the evil, as might have been expected, universal and permanent. Testimonies of this might be adduced from various authorities; but it may be sufficient to cite the work of the able historian of South-Carolina, whose various labors in the cause of literature, entitle him to the gratitude of the country. As the work of this gentleman may not be in the hands of every one who may desire to know the grounds of our opinion, such parts of it will be transcribed as immediately relate to the subject.
“The people of South-Carolina had been but a short time in the possession of their peace and independence, when they were brought under a new species of dependence. So universally were they in debt beyond their ability to pay, that a rigid enforcement of the laws would have deprived them of their possessions and their personal liberty and still left them under incumbrances; for property, when brought to sale under execution, sold at so low a price as frequently ruined the debtor without paying the debt. A disposition to resist the laws became common. Assemblies were called oftener and earlier than the constitution or laws required. The good and evil of representative government became apparent. The Assemblies were a correct representation of the people. They had common feelings, and their situation *397 was in most cases similar. These led to measures which procured temporary relief, but at the expence of the permanent and extended interests of the community. Laws were passed in which property of every kind was made a legal tender in the payment of debts, though payable according to contract in gold or silver. Other laws installed the debt, so that of sums already due, only a third, and afterwards only a fifth, was annually securable in law.” After stating the emission of paper money he proceeds thus:
“The effects of these laws interfering between debtors and creditors were extensive; they destroyed public credit and confidence between man and man, injured the morals of the people, and in many instances ensured and aggravated the final ruin of the unfortunate debtors for whose temporary relief they were brought forward. The procrastination of payment abated exertions to meet it with promptitude. In the mean time, interest was accumulating and the expences of suits multiplied by the number of instalments.” He then states the necessity of the constitution of the United States, the objects provided for by it, and particularly recites the clause under consideration; after which he proceeds: "Their acceptance of a constitution, which among other clauses contained the restraining one which has been just recited, was an act of great self denial. To resign power in possession, is rarely done by individuals, but more rarely by collective bodies of men. The power thus given up by South-Carolina, was one she thought essential to her welfare, and had freely exercised for several preceding years. Such a relinquishment she would not have made at any period of the last five years; for in them she passed no less than six acts interfering between debtor and creditor, with the view of obtaining a respite for the former under particular circumstances of public distress. To tie up the hands of future Legislatures, so as to deprive them of the power of repeating similar acts on any emergency, was a display both of wisdom *398 and magnanimity. It would seem as if experience had convinced the State of its political errors, and induced a willingness to retrace its steps and relinquish a power which had been improperly used.” Upon examining the laws of South-Carolina, it appeared that the last act alluded to by the historian, as interfering between debtor and creditor, was passed the 4th November, 1788. It provides that all debts (with various exceptions) contracted previous to the 1st Jan. 1787, shall be recoverable in instalments, only one fifth to be payable annually on the 25th March in each succeeding year, until the whole is paid. The law also authorises the creditor to demand security.
In the course of an animated picture, traced by the historian, of the effects of the new constitution, he remarks—“Public credit was reanimated. The owners of property and holders of money, freely parted with both, well knowing that no future law could impair the obligation of contracts.”—2 Rams. Hist. S. C. pa. 433. In page 440, the same author, in describing the effects of the embargo of 1807, remarks: “Though the prohibition of exporting the valuable commodities of the country, reduced their price one half, yet the Courts and the Legislature firmly resisted all attempts to obstruct the legal course of justice in favor of debtors. The forbearance of the creditor part of the community generally afforded a shield to property bound by judgments and executions, which without violating the constitution, protected it more effectually than the instalment laws, which had been too easily passed in the period of disorganization preceding the establishment of energetic government in ’89.”
No comment on these extracts is necessary to prove that, in the opinion of the writer, the instalment law could not have been re-enacted after the adoption of the constitution. They may also be fairly considered as furnishing evidence of the sentiments of a respectable State on the same subject, expressed at two different periods, a state which has always *399 abounded with able men at the bar, on the bench and in the legislature.
The same opinion is to be collected from the debates in our convention in 1788, as having been entertained by some eminent citizens, who assisted in forming the constitution, and were present at all the discussions it underwent in the general convention. Whoever will compare an instalment law with a suspension, at the time of their enactment, will probably be induced to give the preference to the former, in relation to the rights of a creditor, and to conclude, if the former violates the constitution, a fortiori the latter does so.
We have thus given the reasons of our opinion, with as much clearness and brevity as the many important causes pressing upon our attention would enable us to do in the intervals of adjournment. For, until the present term, we knew not the opinions of each other. We should have rejoiced if this judgment could have been put in a course of revision before a superior tribunal, or that so interesting a question could have been decided, for the first time, by Judges of more skill and learning than we pretend to possess. Such as it is, we submit it to the candor and good sense of our fellow citizens, who although they may think us in error, to which we are subject in common with the rest of the human family, will do us the justice to believe that such error is neither wilful or agreeable. We have discharged what we believe to be an imperious duty to our country, and the mens conocia recti forms our consolation and support.